NOTICE
Decision filed 08/04/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260242-U

NOS. 5-26-0242, 5-26-0243 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* HADLEY P. and LIAM P., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 23-JA-25, 23-JA-26 |
| | ) | |
| Tara W., | ) | Honorable |
| | ) | Ronald S. Motil, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's finding of unfitness is affirmed where the court's admission of evidence was neither erroneous nor an abuse of discretion, and respondent's due process rights were not violated.

¶ 2   The respondent, Tara W. (Mother), appeals the circuit court's February 20, 2026, order finding her unfit and terminating her parental rights. Tara argues that the circuit court's admission and consideration of her drug test results at the fitness hearing was an abuse of discretion where admission of the evidence violated her constitutional rights. For the following reasons, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4   On June 13, 2023, the State filed petitions for the adjudication of wardship alleging that Hadley P. (age 5) and Liam P. (age 3) were neglected. Count I alleged that the children were

1

neglected due to being in environments injurious to their welfare (see 705 ILCS 405/2-3(1)(b) (West 2022)) based on Tara's illicit drug use that affected her ability to care for the children. Count II alleged the same facts against David P.[1] Attached to the petitions were copies of the Illinois Department of Children and Family Services (DCFS) report indicating that Tara was found unconscious and not breathing due to an overdose on June 6, 2023. The police advised DCFS that methamphetamine and fentanyl were found on the top of a dresser which was within the reach of both children. Following multiple injections of Narcan, Tara was revived and taken to the hospital. Upon her release from the hospital, Tara informed a child protective services worker about her prior drug use and further implicated David stating that he also used methamphetamine in the past.

¶ 5    In addition to the petitions for adjudication of wardship, the State moved for temporary custody of the children and appointment of a guardian *ad litem* (GAL). Following the shelter care hearing held the same day, the court granted both motions providing DCFS with temporary custody of the children and a GAL to represent both children. The court also issued a written order requiring Tara and David to undergo random drug and alcohol testing. The order also provided the location where they were to report for the testing. Urinalysis drug testing performed on Tara on June 13, 2023, revealed positive results for amphetamine, methamphetamine, fentanyl, alcohol, marijuana, and buprenorphine. The drug test results were filed with the court on June 16, 2023.

¶ 6    Caritas Family Solutions (Caritas)[2] prepared a report in anticipation of the adjudicatory hearing. The report indicated that a service plan was developed for Tara that included cooperation with the agency, obtaining and maintaining sobriety, obtaining and maintaining safe and stable housing, obtaining a mental health assessment and a psychological evaluation. The agency

---

[1]David P. is the DNA-confirmed biological father of the children. He is not a party in this appeal. We include the relevant information involving David for clarity of the facts in this case and issues raised on appeal.

[2]Caritas is a subcontractor for DCFS.

2

provided Tara with 1.5 hours of weekly supervised visitation with the children, and Tara attended both of the previously scheduled visits. During those visits, Tara interacted appropriately with the children. The report noted a previous history of DCFS involvement dating back to 2009 that involved two of Tara's other children. That case was ultimately closed when the father of those two children was given full custody. Tara had a history of 12 criminal charges and 2 convictions, the latter involving fraudulent activity and a traffic offense. Caritas reported that Tara was engaged in inpatient substance abuse treatment in Carbondale but left treatment against staff advice. The report also noted that Tara had anger management issues, emotional dysregulation issues, and did not cooperate with the permanency worker.

¶ 7    Caritas also reported that the children were placed with fictive kin. The agency noted that Hadley enrolled in kindergarten the previous school year but did not attend regularly, so it recommended Hadley re-enroll in that grade for the upcoming school year. Hadley had adjusted well to substitute care. The report further revealed that Caritas was concerned that Liam had autism and noted that he would be enrolled in a pre-kindergarten program.

¶ 8    The adjudicatory hearing was held on July 14, 2023. The children were adjudicated neglected by stipulation due to the substance abuse issues of both parents.

¶ 9    Caritas provided an updated report in anticipation of the dispositional hearing. Therein, it was noted that Tara was admitted to inpatient substance abuse treatment on July 13, 2023, and the agency had not yet been able to interview Tara. Tara did not attend the scheduled mental health assessment on July 10, 2023, but it was expected that she would receive mental health treatment while receiving substance abuse treatment.

¶ 10    The dispositional hearing was held on July 28, 2023. David appeared in person, and Tara appeared by Zoom. Both parties stipulated to a finding of unfitness and inability, for a reason other

3

than financial circumstances, to care for, protect, train, or discipline the minor children or were unwilling to do so. They further stipulated that the health, safety, and best interest of the minor children would be jeopardized if the children remained in the parents' custody. A permanency hearing was scheduled for October 27, 2023.

¶ 11 An updated Caritas report rated Tara as satisfactory with the goal of cooperating with the agency but found her unsatisfactory on all of the remaining services. The report noted that Tara again left inpatient treatment against staff advice in August 2023 before she completed the program. Tara completed an assessment for outpatient treatment and tested positive for amphetamine and methamphetamine during the assessment. She was referred for a random drug test on September 26, 2023, but failed to appear. Tara had two hours of weekly supervised visits with the children. She attended two of the nine visits after she left inpatient treatment.

¶ 12 The permanency hearing was held on October 27, 2023. Drug and alcohol testing was filed with the court and revealed that Tara tested positive for methamphetamine, amphetamine, THC, and alcohol. Following the hearing, the court found neither parent made reasonable efforts and set the next permanency hearing for January 26, 2024.

¶ 13 Caritas issued its next report on January 16, 2024. At that time the children had been in foster care for 228 days. Tara remained unsatisfactory on her service plan except for cooperating with the agency. David had satisfactorily completed his service plan. Tara received two hours of weekly visitation at her cousin's house. However, following an altercation between the cousin and Tara on January 10, 2024, the visitations were changed to public places. David had five hours of weekly supervised visitation and now that his home had passed the safety check, he had an additional two hours of supervised visitation in his home.

4

¶ 14    Following the January 26, 2024, permanency hearing, the court found that David was doing well and was making reasonable efforts and progress. The court also found that Tara was not making progress and advised her that she needed to start working all her services. The order noted that Tara tested positive for THC and alcohol at 10:45 a.m. on the date of the hearing and continued Tara's supervised visitation with the children. A copy of Tara's drug testing results was filed with the court.

¶ 15    In anticipation of the April 26, 2024, permanency hearing, Caritas filed an updated report that noted the children had been in care for 319 days. Tara was classified as "unsatisfactory" for all of her recommended services. She completed a new substance abuse assessment on March 7, 2024, and was recommended to engage in outpatient substance abuse, but she had yet to participate in the treatment. The psychological assessment was being held in abeyance until she had negative drug tests and Tara had yet to complete a new mental health assessment despite the referral provided. Tara received two hours of supervised visitation twice a week. David was classified as "satisfactory" for all of his services and had 12 hours unsupervised visitation weekly.

¶ 16    Following the hearing, the court found that David was doing "quite well" and was "making reasonable efforts and progress." Unsupervised visits were going well, so the court increased visitation to overnights at DCFS's discretion As to Tara, the court found she was "not making reasonable efforts or reasonable progress" although she recently found employment and stable housing. Her drug test taken the morning of the hearing was negative for everything except THC. The court noted that Tara was doing better and encouraged her "to work her services." The court ordered Tara's visitation to remain supervised.

¶ 17    On August 2, 2024, Caritas filed an updated report noting the children had been in care for 431 days. The report classified Tara as "unsatisfactory" for all her services. She had not appeared

5

for any drug testing since the test on April 26, 2024. Tara remained on supervised visitation, and the worker noted concerns about Tara's parenting. The report stated that Tara did not pay attention to Liam, was unsure where he was, and on one visit "slapped him when he was fighting her buckling his car seat." David remained satisfactory for all of his services. Hadley successfully completed kindergarten and would start first grade later that month. She was also participating in extracurricular activities. Liam was scheduled for an autism screening in September 2024. He received speech and occupational therapy at school and had an individualized education program (IEP) at school. Caritas recommended that the children be returned to David with the guardianship remaining for an additional six months for aftercare services.

¶ 18     Tara failed to appear at the August 16, 2024, permanency hearing. The court returned the children to David and ordered six months of aftercare services. The court's order found that Tara made neither reasonable and substantial progress nor reasonable efforts toward returning the children home.

¶ 19     Caritas filed a November 2024 updated report noting the children had been in care 519 days. Tara remained unsatisfactory for all her services and had yet to engage in outpatient substance abuse. Tara was removed from visitation due to failing to appear and had no contact with the agency. David remained satisfactory and the children were living with him. Liam's testing revealed he was at level two on the autism spectrum. Neither David nor Tara appeared at the November 15, 2024, permanency hearing, and the court continued the hearing for December 6, 2024.

¶ 20     On November 18, 2024, the State filed an emergency motion to modify disposition. The motion alleged that the children were left with Tara, who was not allowed to have unsupervised visitation with the children. The State asked the court to remove the children from David's care.

6

Following a hearing the same day, in which Tara failed to appear, the court granted the State's motion and ordered both parents to submit to hair follicle drug testing prior to the next court date. David was admonished "that as long as he is with mother, whatever mother's progress is will be considered his progress as well."

¶ 21 The permanency hearing was held on December 6, 2024. Both parents were present and were placed on supervised visitation. The court order indicated that Tara was watching the children because David had issues with daycare due to almost $4,000 in outstanding fees. DCFS was ordered to pay the outstanding daycare fees. The goal was changed to return home in 12 months. The court found that neither David nor Tara made reasonable and substantial progress or reasonable effort in returning the children home. Tara's drug testing was positive for THC.

¶ 22 Following the February 21, 2025, permanency review hearing, the court again found that neither parent was making effort or progress toward the return of the children. David's attorney advised the court that David was considering a surrender of the children. Tara was admonished to engage in services and that the permanency goal was likely to be changed in the future. Tara's February 21, 2025, drug testing was positive for THC and alcohol.

¶ 23 Caritas filed an updated report on May 30, 2025. The children had been in care for 718 days. Tara was classified as satisfactory for cooperating with the agency and maintaining housing. She remained unsatisfactory for her other services. She completed a substance abuse assessment on May 14, 2025, and was recommended to engage in outpatient substance abuse treatment. She missed the first session on May 27, 2025. She also tested positive for THC and alcohol on May 14, 2025. Tara completed a mental health assessment and was recommended to engage in outpatient mental health treatment but had not engaged in the sessions. Tara had not completed a psychological evaluation. Tara had one hour a week of visitation. The report noted that Tara's

7

visits with the children were previously in the community, but Tara was often late or failed to appear. The children were confused and anxious about visits due to her inconsistency and hostility toward the worker. Tara obtained housing at the end of March 2025 and supervised visits were moved to her home. Tara could not care for both children at the same time. When Tara had Hadley, the caseworker had to take on the responsibility for Liam. A permanency hearing was held on June 6, 2025. Tara appeared for the hearing and tested positive for THC. The court found that Tara had not made reasonable progress or efforts toward return of the children.

¶ 24    Caritas filed an updated report on September 8, 2025, noting the children had been in care for 819 days. Tara remained satisfactory on agency cooperation and housing. However, she remained unsatisfactory on substance abuse, mental health, psychological evaluation, and parenting classes. Tara continued to receive positive results of THC and alcohol on her drug testing. She failed to appear for a random test on September 2, 2025. No documentation regarding substance abuse and mental health counseling was received from the providers where Tara was referred. Neither parent appeared at the September 12, 2025, permanency hearing. The State moved to change the goal to substitute care pending determination of termination of parental rights. The State's motion was granted. The court found that neither parent made reasonable progress nor efforts toward returning the children home.

¶ 25    On September 16, 2025, the State filed motions for termination of parental rights. As to Tara, the State alleged that she was unfit because she failed (a) to make reasonable efforts toward the return of the children within the first nine months after the adjudication of neglect (July 14, 2023, to April 14, 2024), (b) to make reasonable progress toward the return of the children within the first nine months after the adjudication of neglect (July 14, 2023, to April 14, 2024), (c) to make reasonable efforts toward the return of the children for the nine month period from April 15,

8

2024, to January 15, 2025, and (d) to make reasonable progress toward the return of the children or the nine month period from April 15, 2024, to January 15, 2025. Therein, the State requested termination of Tara's parental rights. The court issued a notice setting the motion for hearing on December 12, 2025.

¶ 26    On December 4, 2025, Caritas filed an updated report noting the children had been in care for 1,002 days. Tara was listed as unsatisfactory for all services. The agency had no documentation supporting Tara's progress with substance abuse or mental health counseling as their records showed no engagement since July 9, 2025, for either service. Tara also failed to complete any random drug testing since the case opened. The report further revealed that when Tara appeared for visitation, she would be late, which caused the children distress. Tara failed to confirm the most recent visit resulting in its cancellation. Hadley was in second grade and doing well academically. She participated in individual counseling and saw the school social worker when necessary. Liam was attending kindergarten. The children were moved from the long-term fictive kin placement in Vandalia, Illinois, on November 20, 2025, into a licensed traditional home in Lenzburg, Illinois, because the previous caregivers were taking placement of family members from out of state and did not have room for all the children. The new caregivers had two children that got along well with Hadley and Liam. The new caregivers also had experience working with autistic children and were very accommodating to Liam's needs. The children reported they were comfortable and happy in the new placement, and the new caregivers were willing to provide permanency if parental rights were terminated. The report recommended termination of parental rights.

¶ 27    The parties appeared on December 12, 2025, for the hearing on the State's petition to terminate parental rights; however, the hearing was continued to February 20, 2026, to allow the

9

parties to address changes in the law. Tara's drug testing from December 12, 2025, was positive for THC.

¶ 28    An updated report was filed by Caritas on February 10, 2026. Tara remained unsatisfactory for all of her services. As to housing, it was noted that Tara lived in a one-bedroom apartment that was unsuitable for overnight visits. Tara's mental health counseling report revealed that Tara participated in four therapy sessions that were held once a month on June 4, 2025, July 22, 2025, September 17, 2025, and November 12, 2025. She failed to appear for therapy in August, October, and December of 2025 and January 2026. Tara failed to appear for any visitation after October 2025 and also failed to appear for any random drug testing requested by the agency.

¶ 29    A hearing on the State's petition to terminate parental rights was held on February 20, 2026. Tara failed to appear for the hearing. Her attorney requested a continuance but could provide no basis for Tara's absence to the court. The State and the GAL objected to the continuance. The court denied the motion. The State requested the court take judicial notice of the petition for adjudication that was filed on June 13, 2023, the docket order of June 13, 2023, and the temporary custody order entered and filed on June 16, 2023. Tara's counsel had no objection to the court documents other than the hearsay portions of those documents, agreeing that the court had "the right to review" its own records. The court agreed to take judicial notice of its order. The State also requested the court take judicial notice of the drug testing results filed on June 16, 2023, the order of adjudication filed on July 14, 2023, the order of disposition entered July 28, 2023, the permanency review order filed on October 27, 2023, and the drug test results and docket order from the same date, the February 2, 2024 permanency review order, the April 26, 2024, permanency review order and docket order, the August 14, 2024, permanency review order, the October 6, 2024, permanency review order, the December 6, 2024, docket order, and the February

21, 2025, permanency review order. Tara's counsel iterated a continuing objection to the hearsay portions of those court documents. The court overruled the objections and stated it would take judicial notice of the docket entries and court orders. Tara's counsel clarified that her objection was the drug test results because they were hearsay documents. The State argued that the court specifically ordered those drug tests and it was

> "a common practice in this jurisdiction that when respondent parents come
> to court hearings when there are allegations of substance abuse, that the Court
> enters a drug screen before we start the court hearing. That's what was done in this
> case and the Bond County Probation Department that is in the same building and
> on the same floor as this courtroom conducts those tests and files those results in
> the court file."

The court stated that it would maintain its previous overruling of the objections with regard to hearsay and the drug tests.

¶ 30    The State called Haley Zirkelback who testified that she was employed with Caritas Family Solutions for the past five years. She stated that her job entailed ensuring the safety of the children in foster care, helping parents with services, and aiding reunification. She was the foster care case manager in the case and was assigned in October 2024. The previous caseworker was Sara Vadnais, who was now Haley's supervisor. As part of her duties, Haley reviewed the entire case file when she was assigned the case.

¶ 31    Haley testified that the two children came into care in June 2023 because Tara had an overdose in her home and the children were left unsupervised with access to fentanyl and methamphetamines. She explained that an integrated assessment was usually performed by a professional screener who interviewed the parents and created a recommended service plan. She

11

agreed that the integrated assessment was made in the ordinary course of business in court-involved foster care cases and was made as a record of the information and interviews conducted. She stated that the vast majority of the information in the integrated assessment came from the parents' interviews. Haley also confirmed that the written integrated assessment was made within a reasonable time after the assessment.

¶ 32    Tara's assessment was not completed until September 2023 because Tara refused to participate. The assessor rated Tara's prognosis as poor and recommended she complete services. The State submitted the initial integrated assessment for Tara dated September 6, 2023, as an exhibit. Tara's attorney objected on the basis of hearsay. The State asked that it be admitted as a business record and the court overruled the objection and admitted the document.

¶ 33    Haley testified that once she received an initial assessment, she would sit down with her supervisor and form a service plan. Thereafter, the service plans were reviewed every six months to evaluate how the parents were doing in services and whether they were progressing. She agreed that the service plan was a memorandum of record for the expectations in the case, which were prepared in the ordinary course of business and made at the time the services were compiled or within a reasonable time thereafter.

¶ 34    Tara's initial service plan from July 11, 2023, only had one service, which addressed Tara's housing. No other services were recommended because Tara had not yet participated in the integrated assessment. Eventually, based on the case history it was determined what services would be beneficial for Tara, and Tara was informed of those services. Haley identified the second service plan for Tara. The State moved to admit the document. Tara's counsel did not object to the admission of the service plan "subject to exclusion of the hearsay portions therein." The court overruled the objections.

12

¶ 35    Haley testified that Tara's July 2023 services included cooperation with the integrated assessment, a substance abuse assessment with any recommended services, a mental health assessment with any recommended services, a parenting course, a psychological evaluation, and housing. Tara's overall performance on her services from August 2023 to January 2025 was unsatisfactory. During that period, communication with Tara was sporadic. It was difficult to reach her despite her having several phone numbers. Unless Tara showed up for visitation or was in court, she was unwilling to meet with the agency and failed to participate in any child and family team meetings. During that same period, substance abuse remained a priority because that was the reason the children came into care. Tara was referred for an assessment at Prairie Counseling but did not show and instead checked herself into Gateway Rehabilitation for inpatient treatment. Tara did not successfully complete the Gateway treatment and left voluntarily against medical advice. After that, an assessment was scheduled through Chestnut Health Systems in Granite City, Illinois. Tara attended the assessment but did not participate in the follow-up services. When she did not attend any substance abuse treatment classes, Tara was discharged. She did not participate in any of the scheduled drug tests with the agency from September 2023 until May 2025 and did not participate in any substance abuse treatment. Haley explained that if a parent failed to appear for a drug screen, it was presumed positive for all substances. Tara was classified as unsatisfactory as to the substance abuse service.

¶ 36    Haley testified that Tara self-reported that she struggled with mental health illnesses. She remained unsatisfactory for mental health counseling from July 2023 to January 2025. Active referrals were made, but Tara failed to show up and then was unsuccessfully discharged from the treatment at Prairie Counseling. The same thing happened with Chestnut Health Systems in

13

September 2023. Tara participated in no mental health services from September 2023 to January 2025.

¶ 37　As to the housing requirement, Haley explained that Tara did not have stable housing from July 2023 through January 2025. Tara was "bouncing around" between her friend's houses, sleeping on couches. Neither of the friends' homes were suitable for visitation or return of the children. In January 2025 Tara was living in Greenville, Illinois. The home was not appropriate and could not even be used for visitation. Tara was classified as unsatisfactory for the housing service.

¶ 38　Haley testified that a psychological evaluation was also part of Tara's service plan. Haley explained that no evaluation was ever performed because Tara needed to show sobriety before the evaluation would be performed and Tara never got enough drug drops to establish she was sober.

¶ 39　Haley discussed the parenting service that was recommended and explained that it was required because Tara was doing drugs and left the children unsupervised when the children were taken into care. Haley provided Tara with referrals for parenting services, but Tara never engaged in the service or attended any classes. Haley rated Tara as unsatisfactory for parenting services. Haley testified that at no point from July 2023 to January 2025 was Tara ever any closer to having the children returned than when they were taken into custody in July 2023. She stated that Tara remained at supervised visitation. Tara's visitation was sporadic and she would go several months with no contact with the children. When visitation occurred, it did not go well. Tara could not watch both children at the same time.

¶ 40　On cross-examination from Tara's attorney, Haley conceded that the initial integrated assessment submitted by the State did not have the signature of the assessor. She agreed that the final document typically contained those signatures and that the exhibit was not a complete

14

document. She further agreed that the December 4, 2023, service plan was not signed either. She explained that the signed document was in the agency files. Haley stated that the final service plan from June 2025 was emailed to Tara because Tara would not meet with Haley in person. She agreed that the document was unsigned and was not a complete and final document either. Thereafter, Tara's counsel renewed her hearsay objection to those documents and further stated they were not the best evidence that could be presented. In response, the State argued that under the business record exception, there was no requirement that the document be certified or signed. The court overruled the objection.

¶ 41    On redirect, the State addressed the three exhibits. Haley stated they were complete documents based on the information, dates, recommendations and history. She stated that signatures might be missing when clients fail to meet with the agency. She further explained that the signed documents are kept in a file. She stated that during her time on the case, it was difficult to get Tara's signature. She did explain to Tara what was expected of her from the service plan.

¶ 42    The State rested and Tara's attorney advised that she was calling no witnesses. Argument was presented by the State and Tara's attorney. The State reviewed all the evidence submitted and the orders for which the court took judicial notice and asked the court to find Tara was unfit. Tara's attorney argued that everything before October 2024 of Haley's testimony was hearsay and therefore the State failed to prove unfitness for the periods alleged.

¶ 43    The court found that the State met its burden of proof by clear and convincing evidence with regard to the issue of fitness based upon its review of the judicially noticed records as well as Haley's testimony. It found the State proved all four allegations of unfitness stating there had not been reasonable effort or progress by Tara. Thereafter, the court took a break.

¶ 44 Following the break, the court added that in addition to the reasons previously provided for its findings, it also considered the failed "drug testing, continual problems with being on drugs whether in court or testing and I wanted to make sure that is in that section of the case." Thereafter, the court started the best interest hearing.

¶ 45 Haley Zirkelbach returned to the stand. She stated that Hadley was an eight-year-old female and her brother, Liam was five. The children had been in care since June 2023. She stated that the children had physical safety in their current placement that included food, shelter, healthcare, and clothing. The children lived in a two-story home and Hadley shared a room with the foster parents' daughter. Liam had his own room. The family ate together at home and in public and were involved in community activities. Haley stated that the home was appropriate for the minors and she had no concerns. The children were safe and had appropriate clothing. She explained that Liam was diagnosed as autistic but was making huge improvements. He used to just interact on an iPad but now wanted to talk and was making strides with potty training. He was a two on the autism spectrum, which meant he would likely never be able to live on his own. Both foster parents signed commitment forms for each child and were fully aware of Liam's disability. The family integrated the children into their lives as if they were their own biological children. Hadley told Haley that she wanted to stay in the current placement. Liam was not capable of expressing his desires, but Haley stated that "this is the happiest I've seen [Liam] since I've known him." Haley testified that that adoption was in the best interest of both children.

¶ 46 Following the testimony, the parties provided argument. The court found that the State proved by compelling evidence that it was in the best interest of the children to terminate the parental rights permanently. The court stated it "was struck by the testimony how well [the

children] seem to be doing in that foster home" as well as "the sense of attachment that seems to be forming [and] the sense of security they have now in that home." Tara appeals.

¶ 47                                                II. ANALYSIS

¶ 48     Termination of parental rights are governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). See *In re D.T.*, 212 Ill. 2d 347, 352 (2004). Termination involves a two-step process. See 705 ILCS 405/2-29(2) (West 2024). In the first step, the State must prove, by clear and convincing evidence, that a parent is unfit based on one or more of the grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit, a second hearing is held in which the State must prove that termination of the parental rights is in the child's best interest. *In re D.T.*, 212 Ill. 2d at 352. Due to the deep importance of parental rights and responsibilities, findings of unfitness must be supported by clear and convincing evidence. *Id.* at 364.

¶ 49     Here, the State filed motions for termination of parental rights on September 16, 2025, for both children. The pleadings alleged that Tara was unfit pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) because (1) she failed to make reasonable efforts toward the return of the minors within the first nine months following the adjudication of neglect (July 14, 2023, to April 14, 2024); (2) failed to make reasonable progress toward the return of the minors within nine months following the adjudication of neglect (July 14, 2023, to April 14, 2024); (3) failed to make reasonable efforts toward the return of the children during the nine months period from April 15, 2024, to January 15, 2025; and (4) failed to make reasonable efforts toward the return of the children during the nine month period from April 15, 2024, to January 15, 2025.

17

The court found the State proved all four allegations of unfitness. Affirmation of any single ground is sufficient to support the termination of parental rights. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 50    On appeal, Tara contends that the circuit court abused its discretion when it considered and admitted improper evidence consisting of drug test results that were hearsay and violated the best evidence rule, and the admission of that evidence violated her due process rights of confrontation and cross examination under the United States Constitution. In response, the State argues that the hearsay objection was overruled because the records were admitted under the business records exception. The State further argues that the finding of unfitness was sufficiently supported even without the exhibits and judicial notice of the drug testing results.

¶ 51    " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Generally, hearsay is not admissible at trial. *People v. Johnson*, 368 Ill. App. 3d 1146, 1154 (2006). "We review evidentiary rulings on hearsay testimony and any exceptions to hearsay under an abuse of discretion standard." *Taylor v. City of Chicago*, 2024 IL App (1st) 221232, ¶ 105 (citing *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)). An abuse of discretion occurs "only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.* In addressing a hearsay issue, we first determine whether the statement is hearsay and, if it is, whether it falls within a hearsay exception. *Johnson*, 368 Ill. App. 3d at 1155.

¶ 52    Tara argues that the integrated assessment and service plan documentation is hearsay. She further contends that the drug testing results filed with the court during the pendency of the proceedings are hearsay. All the documents contain statements by people other than the parties or

the witnesses at the hearing. As such, we agree that the documents are hearsay and move to a determination of whether the documents fall within a hearsay exception.

¶ 53    While hearsay is generally inadmissible, it becomes admissible when it falls within an exception. *Caffey*, 205 Ill. 2d at 88-89; see also, Ill. R. Evid. 802 (eff. Jan. 1, 2011). For example, section 2-18 of the Act (705 ILCS 405/2-18 (West 2024)) provides guidance about evidence presented at hearing. The section states,

> "Any writing, record, photograph or x-ray of any hospital or private or public agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event related to a minor in an abuse, neglect or dependency proceeding, shall be admissible as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. A certification by the heard or responsible employee or agency of the hospital or agency having knowledge of the creation and maintenance of the matters stated in the writing, record, photograph or x-ray attesting that the document is the full and complete record of the condition, act, transaction, occurrence or event and that it satisfies the conditions of this paragraph shall be *prima facie* evidence of the facts contained in such certification. All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." *Id.* § 2-18(4)(a).

Here, however, the State professed a lack of knowledge regarding any necessary certification of the records at the fitness hearing. As such, this section is inapplicable to overcome the hearsay objection.

¶ 54   Additional exceptions to hearsay are found in the Illinois Rules of Evidence. See Ill. R. Evid. 803 (eff. Jan. 25, 2023); Ill. R. Evid. 804(b) (eff. Jan. 1, 2011). Rule 803 addresses instances where the availability of the declarant is immaterial. Ill. R. Evid. 803 (eff. Jan. 25, 2023). Rule 804 addresses instances where the declarant is unavailable. Ill. R. Evid. 804(b) (eff. Jan. 1, 2011). Here, the basis of the hearsay exception provided by the State was the business record exception found in Rule 803(6) and states,

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11) [Ill. R. Evid. 902(11) (eff. Sept. 28, 2018)], unless the opposing party shows that the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business,

20

institution, association, profession, occupation, and calling of every kind, whether

or not conducted for profit." Ill. R. Evid. 803(6) (eff. Jan. 25, 2023).

¶ 55    The business record exception is further supplemented by Illinois Supreme Court Rule 236.

Ill. S. Ct. R. 236(a) (eff. Aug. 1, 1992). Rule 236 states,

> "Any writing or record, whether in the form of any entry in a book or
> otherwise, made as a memorandum or record of any act, transaction, occurrence, or
> event, shall be admissible as evidence of the act, transaction, occurrence, or event,
> if made in the regular course of any business, and if it was the regular course of the
> business to make such a memorandum or record at the time of such act, transaction,
> occurrence, or event or within a reasonable time thereafter. All other circumstances
> of the making of the writing or record, including lack of personal knowledge by the
> entrant or maker, may be shown to affect its weight, but shall not affect its
> admissibility. The term 'business' as used in this rule, includes business,
> profession, occupation, and the calling of every kind." *Id.*

¶ 56    Here, Haley Zirkelback, a foster care case manager at Caritas for the past five years,

testified that the integrated assessment and service plan documents were kept in the course of a

regularly conducted business, it was the regular practice to prepare those reports, and the reports

were prepared either at the time, or within a reasonable time after the information was provided.

There was no indication that Haley was unqualified to address the business records and there was

no showing that the source of the information contained within the agency reports lacked

trustworthiness. As such, we cannot find that it was an abuse of discretion for the circuit court to

admit the records, despite the hearsay contained therein, under the business record exception.

21

¶ 57   The agency reports addressed the results of the drug tests performed by Tara, as well as Tara's failure to attend the random drug testing and participate in substance abuse counseling, and therefore, that information was admissible. We note, however, that no foundation was provided for the actual Bond County drug testing results filed with the court and therefore, although they were not admitted by the court, we agree that those records, without a proper foundation, would be inadmissible under the business records exception. See *Bank of America, N.A. v. Land*, 2013 IL App (5th) 120283, ¶ 13.

¶ 58   We further note that whether the circuit court took judicial notice of the drug testing results filed with the court cannot be determined by the record. "Judicial notice is an evidentiary concept that allows for the admission into evidence of matters without formal proof." *In re Ch. W.*, 408 Ill. App. 3d 541, 548 (2011). Illinois Rule of Evidence 201(c) (eff. Jan. 1, 2011) provides that "[a] court may take judicial notice, whether requested or not." "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Ill. R. Evid. 201(b) (eff. Jan. 1, 2011). It is well settled that a court "may take judicial notice of public documents which are included in the records of other courts." See *Seymour v. Collins*, 2015 IL 118432, ¶ 6 n.1. However, judicial notice does not override hearsay concerns. See *In re A.B.*, 308 Ill. App. 3d 227, 237 (1999) ("taking judicial notice of matters of record in a court's own proceedings cannot result in admitting hearsay evidence where it would otherwise be prohibited."); see also, 705 ILCS 405/2-18(6) (West 2024) ("In any hearing under this Act, the court may take judicial notice of prior sworn testimony or evidence admitted involving the same minor if *** the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited.").

22

¶ 59    The State's reliance on the court issuing the order requiring Tara's drug testing or the fact that the probation office where drug testing was performed happened to be on the same floor as the judge's courtroom in the courthouse does nothing to undermine case law that prohibits judicial notice of facts that are not allowable for judicial notice. See *id.* Therefore, admission of the Bond County drug testing results pursuant to judicial notice would be error. However, as noted above, the record is unclear as to whether the court admitted the drug testing results pursuant to judicial notice. The court's initial ruling took judicial notice of its docket entries and its orders; the second ruling stated the court was maintaining its initial ruling. As such, it does not appear that the court took judicial notice of the drug tests or erred in its initial ruling. However, even if error were found, the error would be harmless where the same information, with even more detail regarding Tara's failure to appear for drug testing or participate in substance abuse treatment, was properly admitted. See *In re Marriage of Brudd*, 307 Ill. App. 3d 57, 62 (1999) ("To constitute reversible error [by erroneously taking judicial notice of another case file], the petitioner must prove that she was prejudiced to the extent that the evidence materially affected the outcome."). Here, no argument was presented that the evidence materially affected the outcome and therefore, we find the error, even if it did occur, was harmless.

¶ 60    Finally, Tara contends that the court erred by admitting the agency reports because they were not the best evidence. Illinois adopted several rules concerning the use of an original, duplicate, and other means to prove documentary evidence. Ill. R. Evid. 1001 (eff. Jan. 1, 2011) (defining what constitutes a writing, recording, photograph, original and a duplicate); Ill. R. Evid. 1002 (eff. Jan. 1, 2011) (explaining the requirement of an original to prove the content of a writing, recording, or photograph); Ill. R. Evid. 1003 (eff. Jan. 1, 2011) (explaining the admissibility of

23

duplicates); Ill. R. Evid. 1004 (eff. Jan. 1, 2011) (addressing admissibility of other evidence of content).

¶ 61 A duplicate is defined as a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original. Ill. R. Evid. 1001(4) (eff. Jan. 1, 2011). Here, Haley's testimony confirmed that the original document was stored on a computer and would be printed only to obtain signatures that would be placed in a hard file. The documents placed into evidence did not have a signature but were not submitted to show that Tara received and reviewed the document; the documents placed into evidence under the business record exception were submitted to show the services recommended and Tara's progress with the services over time. Therefore, the documents submitted at trial were duplicates of the agency's computer record noting Tara's services and progress. Relevant here, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised about the original's authenticity or (2) the circumstances make it unfair to admit the duplicate in lieu of the original." Ill. R. Evid. 1003 (eff. Jan. 1, 2011).

¶ 62 Here, neither exception applies as no genuine question was raised about the original's authenticity because Haley explained that the documents were the same except hard copies with signatures were placed in the agency file. Further, there was no circumstance presented by Tara in which it would be unfair to admit the duplicate. The agency records were identified by Haley, and she testified as to the accuracy of the information contained therein. Accordingly, we hold that the computer printout of the agency record was a duplicate of the computer record and therefore, no "original" was necessary under the best evidence rule.

¶ 63 The trial court properly admitted the reports from the agency. As such, Tara's claim of a due process violation has no merit. No argument, beyond the hearsay and best evidence claims

24

addressed above, was presented on the merits of the circuit court's findings of unfitness or its termination of Tara's parental rights. Accordingly, we affirm the circuit court's February 20, 2026, orders finding Tara unfit and terminating her parental rights.

¶ 64                                III. CONCLUSION

¶ 65    The circuit court did not err in admitting the State's evidence at the fitness hearing. Therefore, we affirm the circuit court's order finding Tara unfit and terminating her parental rights.


¶ 66    Affirmed.